PREMIER OIL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7996, 20629. Promulgated June 1, 1928.

*Mark F. Mitchell, Esq.*, for the petitioner.
*John D. Foley, Esq.*, and *LeRoy L. Hight, Esq.*, for the respondent.

324

OPINION.

Van Fossan: One of petitioner's witnesses frankly stated that he tells where oil is when he gets through drilling and not before. In many respects this characterization of the oil industry is apt. It is fraught with much uncertainty. Mere proximity to producing property does not assure profitable production. Geologists, engineers, and practical oil operators all admit the presence of a hazard of no mean dimensions. On the other hand, considering a specific property, there may exist a sufficient degree of assurance of success to tempt business men to prospect and to pay for the privilege. Thus, a lease on an unproven oil property may have an actual cash value. This value, however, should not be confused with the chimerical visions of wealth that move the inexpert investors to buy unproven oil stocks.

That the leasehold on petitioner's oil property had a substantial value, both at date of acquisition by petitioner and at March 1, 1913, is conceded by respondent. That it did not have the values claimed in the tax returns is inferentially conceded by petitioner. Our problem is to determine these values.

The witnesses that appeared varied widely both in the values fixed and in the supporting bases given for their estimates. After all, the determination of value is a matter of judgment and opinions are helpful only in so far as they commend themselves as reasonable and founded on sound considerations.

The facts are that there were no producing wells on petitioner's property when the lease was turned in for stock. Thompson and Spellacy had been negotiating for the lease for some time. Wells were being sunk on the Inca property adjoining. Thompson testified that they were waiting for Wells Nos. 6 and 7 on the Inca property to come in before they acquired the lease. These came in on May 2, 1907, and July 27, 1907, respectively.

On August 19, 1907, the lease was signed. It cost Thompson and Spellacy $100,000. About this time, perhaps before the lease was

actually signed, drilling was begun on petitioner's land but no wells were completed before the transfer of the lease. On September 5, 1907, petitioner was incorporated, and on September 30, 1907, the lease was assigned to petitioner in consideration of 1,000,000 shares of stock, of which 200,000 were immediately turned back to the treasury for public sale.

From this set of facts what conclusions may reasonably be drawn? In the first place, it seems reasonable that the sum of $100,000 paid for the lease represented the actual cash value at that date, August 19, 1907. The land was owned by the Union Oil Co., which also owned or controlled the Inca property. Obviously, one oil company does not casually lease to a competitor for $100,000 a property worth $500,000. There is no fact adduced to show that the price paid for the lease was not a fair or reasonable price to pay for a lease on land for oil prospecting. The parties apparently were dealing at arm's length. They had equal knowledge of the facts and of values. We can not escape the conclusion that when Thompson and Spellacy took the lease the price paid for it represented its value.

Six weeks later the lease is turned in to petitioner for stock. Unless the facts are substantially altered, a sale or other fixing of value within six weeks of the basic date is ordinarily a fair measure of value for the basic date. Here the facts bearing on value had not changed. No wells had been completed on the property, or, so far as the evidence shows, on any adjoining property since No. 7 was brought in on the Inca on July 29, or three weeks before the lease was first made. There is not a single fact in evidence demonstrating that the lease had a greater value on September 30, 1907, than it had on August 19, when $100,000 was paid for it. From this it follows that the value of the lease on September 30, 1907, when paid in for stock, was $100,000.

In the face of the logic of the above facts, we can not give controlling weight to opinions however sincerely expressed. It is a very difficult task to put out of one's mind those things which one actually knows, and to view a problem as one would have viewed it twenty years before. Here the parties to the lease fixed its value at $100,000. Perhaps had the uncertainties been removed and had all facts, subsequently discovered, been then known to the parties, they might have fixed a higher value, but their action was taken in the light of all the facts then known, with due regard for the prospects of success and considering the inherent hazards. They acted deliberately and, we believe, rationally. The value so fixed is the best measure of value we have and has been adopted.

The second question is the fair market price or value of the same lease on March 1, 1913. There is no question but that the lease was of greater value than when acquired. There were 15 producing wells

326

on the property. It was proven oil property. Other factors are now to be considered and weighed.

The computations made by petitioner's chief witness assumed a price for oil of from 50 cents to $1 per barrel for the life of the lease, but the record shows that the actual price received by petitioner in 1912 was 32.9 cents and for the first two months of 1913 was 34 cents. The average price received from 1908 to 1913 was 46.1 cents. It also appears that the discovery of a gusher in 1910 had reduced the price from 60 cents at the beginning of the year to 35 cents at the close, and that the effect of this depressant continued through 1913. This fact well illustrates the mercurial character of the oil industry. There could be no assurance that other gushers would not be brought in and that the price would not be yet further reduced. No evidence was offered and none could be submitted giving assurance of higher prices than those prevailing during the preceding years.

We have adopted the figure of estimated oil content used by petitioner as the best evidence obtainable. This was the estimate used by petitioner's chief witness in his appraisal and the same was not directly attacked by respondent. To that we have added the actual production from March 1, 1913, to the date of the appraisal. Accepting the estimated oil reserve as of March 1, 1913, as 3,877,343 barrels and assuming a price of 46.1 cents as the reasonably expected future price of oil, and applying the total costs of 27.4 cents per barrel, as computed by petitioner's witness, we arrive at a figure of approximately $350,000, which we adopt and approve as the fair market price or value of the lease on March 1, 1913.

The deficiencies, if any, should be recomputed in accordance with the above findings.

*Judgment will be entered under Rule 50.*